Jiffy Mini Mart, Inc. and : 
Commonwealth Gaming LLC, : 
           Petitioners : 
            : 
      v. :     No. 1661 C.D. 2019 and
            :     No. 58 C.D. 2020
Pennsylvania Gaming Control : 
Board, : 
           Respondent :     SUBMITTED: June 12, 2020

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                          FILED: July 7, 2020

In these consolidated appeals, Jiffy Mini Mart, Inc. (Jiffy) and Commonwealth Gaming LLC (Commonwealth Gaming) petition for review of the October 31, 2019 Order of the Pennsylvania Gaming Control Board (Board) granting Jiffy a video gaming terminal establishment license (License)[1] under the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa. C.S. §§ 1101-1904,[2] and the Board's December 27, 2019 Adjudication in support of its October 31, 2019 Order. These appeals challenge the Board's authority under the

---

[1] Although both Jiffy and Commonwealth Gaming are Petitioners before this Court, Commonwealth Gaming was an intervenor in the proceedings before the Board and was not directly aggrieved by the Board's October 31, 2019 Order granting Jiffy's License. For this reason, we refer only to "Jiffy" throughout this Opinion in discussing the issues and arguments presented on appeal.

[2] In October 2017, the General Assembly amended the Gaming Act by enacting Act 42 of 2017, which expanded legalized gaming to include the operation of video gaming terminals by entities that meet the definition of a "truck stop establishment." *See* 4 Pa. C.S. §§ 3101-4506.

Gaming Act and its regulations to impose conditions on the grant of Jiffy's License. For the reasons that follow, we affirm the Board's October 31, 2019 Order and dismiss Jiffy's appeal from the December 27, 2019 Adjudication.

### Background

Jiffy is a gas station owned by Hirdaypal and Herminder Gill. Jiffy is located in Shippenville, Pennsylvania, on Route 66 near an interchange with Interstate 80. The Gills purchased Jiffy in 2011. The property is situated on a 3.176-acre parcel of land and consists of fuel islands, a gravel parking lot that can accommodate at least 20 commercial vehicles, and a convenience store.

Commonwealth Gaming is a licensed video gaming terminal operator. On February 4, 2018, Commonwealth Gaming and Jiffy entered into a Terminal Placement Agreement that gave Commonwealth Gaming the exclusive right to place video gaming terminals inside Jiffy's facility.

On May 7, 2018, Jiffy filed with the Board an Application for a Video Gaming Terminal Establishment License (Application). The Gaming Act defines an "establishment license" as "a license issued by the board authorizing a truck stop establishment to permit a terminal operator licensee to place and operate video gaming terminals on the truck stop establishment's premises." 4 Pa. C.S. § 3102. Under the Gaming Act, the Board was required to issue a conditional establishment license within 60 days of receiving an application if the applicant: (1) was never convicted of a felony; (2) was current on all state taxes; (3) submitted a completed application; and (4) was never convicted of a gambling law violation. *Id.* § 3520(a)(2). A conditional license remains in effect until the Board either approves or denies the application for full licensure. *Id.* § 3520(a)(4).

2

At the time of its Application, Jiffy submitted its recent monthly diesel and biodiesel sales figures, and later provided the Board with updated figures through December 2018, as follows:

- January 2018: 30,019 gallons
- February 2018: 28,506 gallons
- March 2018: 32,007 gallons
- April 2018: 45,006 gallons
- May 2018: 41,519 gallons
- June 2018: 40,019 gallons
- July 2018: 45,527 gallons
- August 2018: 43,020 gallons
- September 2018: 31,522 gallons
- October 2018: 62,543 gallons
- November 2018: 30,015 gallons
- December 2018: 32,006 gallons

Bd.'s Adjudication, 12/27/19, at 3.

In its Application, Jiffy projected that it would sell an average of 53,889 gallons of diesel fuel sales each month in 2018; 61,417 gallons per month in 2019; 54,167 gallons per month in 2020; 55,833 gallons per month in 2021; and 60,000 gallons per month in 2022. Jiffy also outlined the initiatives it had undertaken, or was planning to undertake, to increase diesel fuel sales, which included adding new diesel islands and canopies, advertising, applying for a sign on Interstate 80, and adding a full-service fast food restaurant to its facility.

The Board granted Jiffy a conditional establishment license on August 15, 2018, which was the first step toward obtaining full licensure. The Board then

3

referred the Application to its Bureau of Investigations and Enforcement (Bureau) for a full investigation of both the Application and Jiffy's facility.

On February 13, 2019, the Bureau's Office of Enforcement Counsel (OEC) sent Jiffy a Notice of Recommendation of Denial (Denial Notice), in which it objected to Jiffy's Application and recommended that the Board deny the Application. OEC opined that Jiffy was ineligible for a video gaming terminal establishment license because it did not meet the Gaming Act's definition of a "truck stop establishment." The Gaming Act defines a "truck stop establishment" as follows:

> A premises that:
>
> (1) Is equipped with diesel islands used for fueling commercial motor vehicles.
>
> (2) Has sold on average 50,000 gallons of diesel or biodiesel fuel each month for the previous 12 months or *is projected to sell an average of 50,000 gallons of diesel or biodiesel fuel each month for the next 12 months.*
>
> (3) Has at least 20 parking spaces dedicated for commercial motor vehicles.
>
> (4) Has a convenience store.
>
> (5) Is situated on a parcel of land of not less than three acres that the truck stop establishment owns or leases.
>
> (6) Is not located on any property owned by the Pennsylvania Turnpike.

4 Pa. C.S. § 3102 (emphasis added).

In the proceedings before the Board, the parties agreed that Jiffy met five of the six requirements. The only requirement at issue was whether Jiffy was

4

"projected to sell an average of 50,000 gallons of diesel or biodiesel fuel each month for the next 12 months." *Id.*[3] In issuing its Denial Notice, OEC stated:

> According to the documents provided, [Jiffy] sold only an average of 38,745.75 gallons of diesel or biodiesel fuel per month between January 2018 and December 2018. While [Jiffy] did provide projections regarding future biodiesel and diesel fuel sales, [it] did not provide documentation supporting those projections[,] nor do the reasons cited for the projected fuel sales support what would be an additional 11,524.25 gallon per month average in fuel sales.

Reproduced Record (R.R.) at 3a.[4]

In response to the Denial Notice, Jiffy requested a hearing before the Board's Office of Hearings and Appeals, which was granted. The Office of Hearings and Appeals also granted Commonwealth Gaming permission to intervene in the matter.

Before the hearing, OEC and Jiffy stipulated to several facts, including that "[Jiffy] projected that it would sell an average of 50,000 gallons of diesel or biodiesel fuel [per] month for the following twelve (12) months." R.R. at 25a.

A Hearing Officer held an evidentiary hearing on May 9, 2019. At the hearing, Jiffy presented the testimony of its owner, Mr. Gill, and its expert witness, Robert S. Terrill, as well as documentary evidence supporting its diesel fuel sales projections.

---

[3] It was also undisputed that Jiffy did not sell an average of 50,000 gallons of diesel or biodiesel fuel each month for the prior 12 months before filing its Application.

[4] In its Denial Notice, OEC also opined that Jiffy was "not suitable" for licensure because it provided what OEC believed was "false and misleading" information in its Application. R.R. at 1a, 3a-4a. However, at the May 9, 2019 hearing, OEC's counsel stated that OEC was no longer pursuing that basis for denial, and Jiffy's counsel clarified that "the definition of truck stop and *more specifically . . . the monthly gallon issue is the only factual issue before [the Hearing Officer] today*." Notes of Testimony (N.T.), 5/9/19, at 8 (emphasis added).

5

Mr. Gill testified that he owns five gas service stations including Jiffy, which he purchased in 2011. N.T., 5/9/19, at 20, 24. When Mr. Gill purchased Jiffy, the facility had no diesel fuel pumps and no capacity to sell diesel fuel. *Id.* at 24-25. When he initially purchased the facility, Mr. Gill increased overall sales by cleaning up the store and moving the bathrooms to the back of the store. *Id.* at 25.

In April 2015, Mr. Gill installed five diesel fuel pumps with a canopy and a new pricing sign to allow for diesel fuel sales. *Id.* at 26. Since then, Jiffy's diesel fuel sales went from zero gallons per month to approximately 40,000 gallons per month. *Id.* at 27.

Mr. Gill then testified about his efforts to improve the facility and his planned initiatives to increase diesel fuel sales to 50,000 gallons per month. *Id.* at 34-35. First, Mr. Gill testified that he planned to install a 60-foot LED sign with a price display that is visible from Interstate 80. *Id.* at 35. Mr. Gill stated that the infrastructure for the sign was already in place, and he expected the new LED sign to be active "within a month or two." *Id.* at 35-36, 47. Second, Mr. Gill planned to add a name-brand fast food restaurant to his facility, such as Krispy Krunchy Chicken or Subway, and had already spoken with representatives from those restaurants. *Id.* at 37.

Third, Mr. Gill testified that he had arranged to accept third-party credit cards used by major trucking companies. *Id.* at 37-40. He was aware that, in the past, truck drivers have parked at Jiffy's property without purchasing fuel because Jiffy did not accept these cards. *Id.* at 41. Finally, Mr. Gill testified that he was aware that trucks are now required to use diesel exhaust fluid for environmental reasons. *Id.* at 44-45. He explained, "I [had] already put the [diesel] pumps [in] before I learned [about diesel exhaust fluid]. But now I know that . . . it is there. [R]ight

6

now . . . we are going to only put it on the side [of the pump], [as a] separate product." *Id.* at 45. Mr. Gill placed the diesel exhaust fluid in separate gallon containers next to the diesel pumps, and truck drivers would manually add it. *Id.* at 152.

Mr. Gill testified that he reviewed Mr. Terrill's expert report, agreed with Mr. Terrill's conclusions, and planned to implement the specific changes Mr. Terrill recommended for increasing Jiffy's diesel fuel sales. *Id.* at 46, 48. Mr. Gill believed that by installing the 60-foot LED sign at the facility, he was "confident" that he would achieve 50,000 gallons per month in diesel fuel sales. *Id.*

On cross-examination, Mr. Gill testified that, with regard to the diesel fuel sales projections in Jiffy's Application, he came up with those projections "on his own," did not consult with an expert, and did not review industry guides. *Id.* at 59-60.

Jiffy also presented Mr. Terrill as an expert witness. Mr. Terrill is the President and Chief Executive Officer of a company that conducts site feasibility studies for gas stations and grocery stores. *Id.* at 89-90. Mr. Terrill testified that he has 26 years of experience performing fuel sales projections. *Id.* at 127.

Mr. Terrill conducted a site feasibility study for Jiffy and prepared a written report on April 23, 2019. *Id.* at 110; *see* R.R. at 464a-82a. According to Mr. Terrill, Jiffy has one of the highest truck counts in the country, with approximately 14,000 trucks passing the interchange each day. N.T., 5/9/19, at 111. Mr. Terrill testified when he reviewed the traffic counts for the highways where Jiffy is located, he believed that "the opportunity is there. The potential is there. We just have to get a facility that's going to . . . draw in more trucks." *Id.* at 111-112.

As part of his feasibility study, Mr. Terrill recommended that Jiffy undertake specific initiatives to increase its diesel fuel sales. First, Mr. Terrill testified that

7

Jiffy should accept major third-party credit cards and notify trucking companies that Jiffy accepts such cards, because all major trucking companies use these cards. *Id.* at 112-14.

Next, Mr. Terrill testified that Jiffy should install the 60-foot LED sign on Interstate 80. According to Mr. Terrill, having an LED sign visible from Interstate 80 will attract additional truck drivers. *Id.* at 141-42. Mr. Terrill believed that installing the new LED sign would increase Jiffy's fuel sales by 5%. *Id.* at 142.

Mr. Terrill also testified that Jiffy should add a major fast food franchise and include the franchise's logo on the new LED sign. *Id.* at 146-47. He believed that Jiffy's sales would increase by 5% "just by [potential customers] knowing [Jiffy] has food available." *Id.* at 146. Specifically, Mr. Terrill testified that if Mr. Gill added a Krispy Krunchy Chicken franchise, traffic should increase by 5%; if he added a Subway franchise, traffic should increase by 25%. *Id*. at 148-49.

Mr. Terrill also recommended that Jiffy install diesel exhaust fluid hoses to its existing diesel fuel islands. *Id.* at 151. Mr. Terrill testified that all trucks manufactured after 2011 – about 40% of trucks on the road – are required to use diesel exhaust fluid. *Id*. at 151-53. Mr. Terrill stated that Mr. Gill "missed [doing that] initially, due to his inexperience with truck stops." *Id.* at 151. Mr. Terrill believed that adding diesel exhaust fluid hoses to Jiffy's existing diesel islands would help Jiffy "level [the] playing field" and allow Jiffy to better compete with other major truck stops. *Id.* at 154.

Finally, Mr. Terrill recommended that Jiffy pave at least one acre of its existing parking lot. *Id.* Mr. Terrill testified that several trucking companies do not allow their trucks to park on unpaved lots. *Id.* at 155. Mr. Terrill believed that if Mr. Gill paved the parking lot, truck drivers would be more inclined to spend the

night there, and if they see that Jiffy accepts third-party credit cards, they will be more inclined to purchase fuel. *Id.*

According to Mr. Terrill, if Mr. Gill implements his recommendations, Jiffy's diesel fuel sales should increase to at least 53,000 gallons per month by the end of 2019. *Id.* at 158. Mr. Terrill testified that Jiffy could reach 125,000 gallons per month within one year of implementing his recommendations. *Id.* at 187-88. Mr. Terrill further opined that Jiffy's initial projection that it would average more than 50,000 gallons of diesel fuel sales each month was "reasonable and accurate." *Id.* at 157. This testimony was consistent with Mr. Terrill's written report, in which he concluded: "Based on existing operations and site conditions [at Jiffy's facility], and recent improvements, it is my opinion that even without any substantial additional changes, the existing facility will easily surpass an average of 50,000 gallons of diesel fuel sales per month." R.R. at 466a.

On September 26, 2019, the Hearing Officer issued her Report to the Board, outlining the evidence presented and the parties' respective positions. After reviewing the Hearing Officer's Report and the evidentiary record, the Board addressed this matter at a public meeting on October 30, 2019.

On October 31, 2019, the Board voted unanimously to deny OEC's Recommendation of Denial, thereby granting Jiffy full licensure as a truck stop establishment under the Gaming Act. However, the Board stated that "[s]aid licensure is subject to [Jiffy] demonstrating *substantial compliance with the recommendations of its expert, Robert S. Terrill*." Bd.'s Order, 10/31/19, at 1 (emphasis added). Specifically, the Board directed that Jiffy substantially comply with the following six conditions recommended by Mr. Terrill:

9

• Accept major third-party fleet credit cards used by trucking companies;

• Contact the traffic managers of major trucking companies to let them know that the truck stop accepts the major fleet cards and ask to be placed on the companies' preferred vendor lists;

• Install a 60-foot LED sign visible from Interstate 80;

• Add a name-brand fast food restaurant and include the restaurant's logo on the LED sign;

• Add diesel exhaust fluid hoses to the diesel fuel island; and

• Pave at least one acre of the parking lot to allow for approximately 25 trucks.

*Id.*

On November 26, 2019, Jiffy appealed to this Court from the Board's October 31, 2019 Order.[5] On December 27, 2019, the Board issued an Adjudication in support of its October 31, 2019 Order. In its Adjudication, the Board found that "Mr. Terrill's testimony [was] credible and that through [his testimony], *[Jiffy] presented a clear and convincing case that it will exceed the 50,000-gallon threshold after complying with the initiatives outlined by Mr. Terrill.*" Bd.'s Adjudication, 12/27/19, at 14 (emphasis added). The Board then explained:

> Section 3301(b)(3) of the [Gaming] Act also gives the Board[] the "power and the duty. . . [a]t its discretion, to award, revoke, suspend, *condition* or deny issuance or renewal of establishment licenses." 4 Pa.[]C.S. § 3301(b)(3) (emphasis added). In addition, [Section 3514(d)(3) of the Gaming Act,] 4 Pa.[]C.S. § 3514(d)(3)[,] provides

---

[5] Our review of the Board's Order is limited to determining whether constitutional rights were violated, whether the Board committed an error of law, and whether the Board's necessary findings of fact are supported by substantial evidence. *Keystone Redev. Partners, LLC v Pa. Gaming Control Bd.*, 5 A.3d 448, 456 n.10 (Pa. Cmwlth. 2010).

10

that the Board "may approve" an application for an establishment license **subject to "[o]ther conditions established by the [B]oard.**" Since [Jiffy] has a continuing obligation to maintain eligibility, and because [Mr. Gill] committed on the record under oath to implement the recommendations, the Board believes it is prudent and necessary to impose these conditions, consistent with [Jiffy's] expert's recommendations, to ensure that [Jiffy] remains eligible. *The Board's finding that [Jiffy] is projected to sell more than 50,000 gallons of diesel or biodiesel fuel each month in the following 12 months is dependent upon [Jiffy] implementing the initiatives recommended by Mr. Terrill. Accordingly, the Board shall require, as a part of its [L]icense, that [Jiffy] substantially comply with Mr. Terrill's initiatives.*

*Id.* at 14-15 (third emphasis added).

On January 24, 2020, Jiffy appealed to this Court from the December 27, 2019 Adjudication. This Court consolidated the appeals for disposition.

## Issues

(1)     Is the Board's December 27, 2019 Adjudication an appealable order?

(2)     Was the Board required to accept Jiffy's initial diesel fuel sales projections stated in its Application, where Jiffy subsequently provided evidence and expert testimony establishing the validity of such projections?

(3)     Does the Board's October 31, 2019 Order conflict with the language of the Gaming Act and the Board's regulations, where they do not: (a) provide any criteria for the review of an applicant's future fuel sales projections; (b) allow the Board to reject an applicant's future fuel sales projections; or (c) authorize the Board to impose conditions that are not found in the Gaming Act in determining an applicant's eligibility for licensure as a truck stop establishment?

(4)     Was the Board's October 31, 2019 Order granting Jiffy's License subject to conditions supported by substantial evidence, where the evidence

11

established that Jiffy met the statutory and regulatory requirements for full licensure as a truck stop establishment under the Gaming Act without conditions?

## Analysis

### 1. Appealability of the Board's December 27, 2019 Adjudication

Preliminarily, we must address the appealability of the Board's December 27, 2019 Adjudication.

On November 26, 2019, Jiffy filed a Petition for Review of the Board's October 31, 2019 Order granting Jiffy's License, subject to the six conditions outlined in the Order. This appeal is docketed at 1661 C.D. 2019.

On January 24, 2020, Jiffy filed a Petition for Review of the Board's December 27, 2019 Adjudication. This appeal is docketed at 58 C.D. 2020. However, the December 27, 2019 Adjudication is actually an opinion explaining the legal rationale for the Board's October 31, 2019 Order. The Adjudication includes findings of fact and conclusions of law, but does not itself contain an order from which Jiffy could have appealed. At the conclusion of the Adjudication, the Board merely restates the disposition and conditions included in its prior Order.

In its Petition for Review at 58 C.D. 2020, Jiffy contends that the Board lacked jurisdiction to issue the December 27, 2019 Adjudication because: (i) it was issued after the record was closed and jurisdiction had been vested in this Court by the filing of the Petition for Review at 1661 C.D. 2019; and (ii) the Board's rules do not allow it to issue an Adjudication after it has already issued a final order.[6]

The Board's regulations define a "final order" as "[a]n action by the Board which approves, issues, renews, revokes, suspends, conditions, denies issuance or

---

[6] In its appellate brief, Jiffy states that it "filed the second [P]etition [for Review] out of an abundance of caution, as it is not clear whether the [Board's October 31, 2019] Order or the [December 27, 2019] Adjudication constituted a final, appealable order." Jiffy's Br. at 9 n.2.

renewal of a license, permit, certification or registration." 58 Pa. Code § 401a.3. Thus, it is clear that the October 31, 2019 Order granting Jiffy's License subject to conditions was a final, appealable order. *See* 4 Pa. C.S. § 3304; Pa. R.A.P. 341(a).

The Board's December 27, 2019 Adjudication, however, was not an "order," nor did it amend or modify the Order already entered. Rather, the Adjudication provided the Board's rationale for issuing the October 31, 2019 Order. In its Adjudication, the Board stated that after the October 30, 2019 public meeting, "the Board voted unanimously to deny OEC's Recommendation of Denial and grant [Jiffy] a license subject to 6 conditions, which were outlined in the Board's Order. *This Adjudication provides the basis for the Board's decision.*" Bd.'s Adjudication, 12/27/19, at 1-2 (emphasis added).

Pa. R.A.P. 1701(b)(1) provides that "[a]fter an appeal is taken or review of a quasijudicial order is sought," a government agency, such as the Board, "may . . . take other action permitted or required by these rules or otherwise ancillary to the appeal or petition for review proceeding." Further, Pa. R.A.P. 1951(c) requires a government agency to comply with Pa. R.A.P. 1925 by issuing an opinion or statement of reasons in support of a quasijudicial order.

We conclude that the Board's December 27, 2019 Adjudication was not an appealable order, but the equivalent of an opinion in support of its prior Order pursuant to Pa. R.A.P. 1925. In addition to making findings of fact and conclusions of law in support of its prior Order, the Board reiterated that it was granting Jiffy's License subject to its substantial compliance with the same six conditions outlined in its prior Order. Bd.'s Adjudication, 12/27/19, at 14. Therefore, to the extent the December 27, 2019 Adjudication provides the Board's reasons for granting Jiffy's License subject to conditions, we consider the Adjudication in conjunction with the

appeal docketed at 1661 C.D. 2019 and dismiss the appeal docketed at 58 C.D. 2020 as duplicative.

## 2. The Board's Rejection of Jiffy's Initial Projections

First, Jiffy contends that the Board lacked authority to reject Jiffy's initial diesel fuel sales projections outlined in its Application. Jiffy argues that the Board should have accepted Mr. Gill's projected diesel fuel sales included in the Application. According to Jiffy, the Gaming Act expressly allows for projections and does not permit the Board to reject an applicant's projections. In effect, Jiffy contends that the Gaming Act's requirement that an establishment be "projected to sell an average of 50,000 gallons of diesel or biodiesel fuel each month for the next 12 months," 4 Pa. C.S. § 3102, should be construed to mean that an applicant need only aver that it will meet this threshold to establish its eligibility for an establishment license. We disagree.

Contrary to Jiffy's contention, the Board is not required to simply accept an applicant's assertion that it meets the eligibility requirements for an establishment license. The Board's regulations clearly place the burden on the applicant to *prove* its eligibility. *See* 58 Pa. Code § 421a.l(h) (stating that "[a]n applicant *shall at all times have the burden of proof*") (emphasis added). Moreover, under the Gaming Act, an applicant for an establishment license "*shall continue to provide information required by the [B]oard or the [B]ureau and cooperate in any inquiry or investigation*" while its application is pending. 4 Pa. C.S. § 3514(c) (emphasis added). The Gaming Act further states that "[n]othing contained in [the Gaming Act] is intended or shall be construed to create an entitlement to a license." *Id.* § 3516(a)(2). These provisions demonstrate that, once Jiffy's eligibility was

14

questioned by the OEC, Jiffy was no longer permitted to rely on the averments in its Application.

Notably, when OEC objected to Jiffy's initial diesel fuel sales projections as being unsupported by any documentation, Jiffy did not simply allow the Board to consider the matter based on Mr. Gill's initial estimates. Instead, *Jiffy requested a hearing and retained Mr. Terrill as an expert witness*. Mr. Terrill prepared an expert report and offered detailed testimony regarding Jiffy's projected diesel fuel sales, including the steps he believed Jiffy needed to take to "sell an average of 50,000 gallons of diesel fuel each month for the next 12 months" as required by the Gaming Act. The Board then relied on Mr. Terrill's expert testimony in granting Jiffy's License with conditions, which was within its authority under the Gaming Act. *See* 4 Pa. C.S. § 3301.

We agree with the Board that if the Board were required to simply accept projections submitted by an applicant, with no evidence or other documentation to support such projections, it would lead to an incongruous result. Such an interpretation would effectively allow an applicant to simply state in its application that it is projected to sell 50,000 gallons per month in the next 12 months, with no factual basis for making such a projection.

Moreover, in this case, the record shows that Mr. Gill's projections for 2018 and early 2019 were not accurate. Mr. Gill had attested in his Application that Jiffy would average 50,000 gallons of diesel fuel sales per month for the years 2018 through 2022. N.T., 5/9/19, at 58. However, in 2018, Jiffy sold an average of only 38,475.75 gallons per month. *Id.* at 55. In the first quarter of 2019, Jiffy sold an average of only 38,251 gallons per month. *Id.* at 56-57. Mr. Gill testified that "[f]rom . . . March through September is the busiest [time]. We . . . probably do

15

50,000 [gallons] in a month on those months." *Id.* at 57. Yet in March 2019, Jiffy sold 41,023 gallons, and in April 2019, Jiffy sold 41,013 gallons. *Id.* Finally, Mr. Gill admitted that he came up with his diesel fuel sales projections "on his own," did not consult an expert in making those projections, and did not review industry guides before making those projections. *Id.* at 59-60.

Jiffy also asserts that the Board erred in rejecting Mr. Gill's initial fuel sales projections because Mr. Terrill ultimately opined that they were "reasonable and accurate." *Id.* at 157. However, Mr. Terrill qualified his response by stating, "I believe that with the first three things I mentioned, [Jiffy] should go up to at least 53,000 gallons [per] month . . . by the end of [2019]." *Id.* at 158. Mr. Terrill later explained that by "three things," he was referring to installing the 60-foot LED sign, accepting third-party credit cards, contacting trucking companies about the acceptance of such cards, and placing the fast food restaurant logo on the LED sign. *Id.* at 188.

We conclude that the Board did not err in rejecting Jiffy's initial diesel fuel sales projections in its Application and relying instead on Jiffy's evidence, and particularly its expert's testimony, presented at the hearing.

### 3. The Board's Authority to Impose Conditions

Next, Jiffy contends that the Board lacked authority to impose conditions on Jiffy's License because the Gaming Act requires only that an applicant provide a "projection" of future diesel fuel sales. In essence, Jiffy argues that, as long as an applicant avers that it satisfies the requirements for a "truck stop establishment" specified in the Gaming Act, the Board must grant an establishment license without conditions. We disagree.

16

Jiffy's argument is plainly inconsistent with the language of the Gaming Act, which states that the Board "shall have *sole regulatory authority over every aspect* of the conduct of video gaming."  4 Pa. C.S. § 3301(a)(l) (emphasis added).  The Gaming Act specifically authorizes the Board to impose conditions on an establishment license.  Section 3301(b)(3) provides that the Board "*shall have* discretion[] to award, revoke, suspend, *condition* or deny *issuance or renewal of establishment licenses*." *Id.* § 3301(b)(3) (emphasis added).  Likewise, Section 3514(d)(3) provides that after being satisfied that the applicant has met the "general requirements" for an establishment license, "the [B]oard may approve the application and issue the applicant an establishment license consistent with . . . *[o]ther conditions established by the [B]oard*." *Id.* § 3514(d)(3) (emphasis added).  Further, Section 3516(a)(1) states that any truck stop establishment "that the [B]oard approves as qualified to receive a license . . . *shall be issued a license* or permit upon payment of [the required] fee . . . and *upon the fulfillment of conditions required by the [B]oard* or provided for in this part." *Id.* § 3516(a)(l) (emphasis added).  These provisions clearly give the Board the authority to impose conditions, at its discretion, on an eligible truck stop establishment.  Therefore, we reject Jiffy's claim that the Board was not authorized to impose conditions on Jiffy's License.

### 4.  The Board's Interpretation of the Gaming Act and its Regulations

Jiffy argues that the Gaming Act only requires that an applicant attest that it "is projected to sell" an average of 50,000 gallons of diesel fuel per month in the next 12 months.  4 Pa. C.S. § 3102.  Jiffy claims that the Board exceeded its authority by adding new requirements, not present in the Gaming Act, that an applicant must: (1) submit evidence that its diesel fuel sales projections were "based on a current

17

trend" or "calculated from information already known"; and (2) prove the validity of its projections by clear and convincing evidence.[7]

First, we address the Board's interpretation of the term "projection" in the Gaming Act's definition of "truck stop establishment." The Board began its analysis by recognizing that the Gaming Act itself does not define the term "projection." The Board explained:

> The term, ["]projection,["] is not defined in the [Gaming] Act; therefore, rules of statutory construction require looking at the "common and approved" meaning. [Section 1903 of the Statutory Construction Act of 1972,] 1 Pa.[]C.S. § 1903(a). The common and approved meaning can be found in the dictionary definition of "projection." *See Therres v. Zoning Hearing Bd. of Borough of Rose Valley*, 947 A.2d 226, 230 (Pa. [Cmwlth.] 2008) (stating that "Pennsylvania courts generally use dictionaries as source material to determine the common and approved usage of terms not defined in statutes"). The Merriam-Webster dictionary definition of "projection" is, "an estimate of future possibilities *based on a current trend*." The Cambridge Dictionary defines "projection" as "an amount or result expected in the future *that is calculated from information already known*." These definitions suggest that for an estimate to be considered a projection, it must be based on a current trend or a calculation from information already known.

Bd.'s Adjudication, 12/27/19, at 9-10 (some citations omitted) (emphasis in original).

---

[7] In its appellate brief, Jiffy also argues that by interpreting the Gaming Act and its regulations in this manner, the Board violated the Commonwealth Documents Law by creating a *de facto* regulation without following the proper rulemaking process. However, Jiffy did not raise this issue in either of its Petitions for Review filed with this Court. Although the first Petition for Review was filed *before* the Board issued its Adjudication explaining the legal rationale for its prior Order, the second Petition for Review was filed *after* the Board's Adjudication. Because Jiffy raised this issue for the first time in its appellate brief, we conclude that it is waived. *See* Pa. R.A.P. 1513; *Mostatab v. State Bd. of Dentistry*, 881 A.2d 1271, 1273 (Pa. Cmwlth. 2005).

Generally, when a statute's language is ambiguous, a reviewing court must give deference to the government agency's interpretation. *Scanlon v. Dep't of Pub. Welfare*, 739 A.2d 635, 638 (Pa. Cmwlth. 1999). However, the Pennsylvania Supreme Court recently addressed the issue of an appellate court's deference to agency interpretations of statutes as follows:

> It is clear that *one of the factors to be considered when ascertaining the intent of the General Assembly with regard to the meaning of statutory language is any "[l]egislative and administrative interpretations of such statute."* 1 Pa.C.S. § 1921(c)(8). This Court has held "[a]n interpretation by the agency charged with the administration of a particular law is normally accorded deference, unless clearly erroneous." *Harkness v. [Unemployment Comp. Bd. of Review]*, . . . 920 A.2d 162, 171 ([Pa.] 2007). Moreover, since *Harkness*, we have described two types of agency interpretations which are accorded different levels of deference. Agency interpretations that are promulgated in published rules and regulations have been referred to as "legislative rules" and "are accorded a particularly high measure of deference[,]" . . . and "enjoy a presumption of reasonableness[.]" Non-legislative rules, also known as "interpretive rules" or "guidance documents," such as "manuals, interpretive memoranda, staff instructions, policy statements, circulars, bulletins, advisories, [and] press releases" are accorded "a lesser quantum of deference[,]" . . .which allows an agency's interpretation to be disregarded when a court is "'convinced that the interpretative regulation adopted by an administrative agency is unwise or violative of legislative intent.'" Notably, although we have considered these varied situations where agency interpretations inform our statutory construction analysis, and have ascribed some measure of value to those interpretations under certain circumstances, we have never held the agency's opinion is binding on this Court, and of course it is not. *Indeed, we have declined to accord any deference to an agency's interpretation of a statute where "there is nothing in the record indicating that the [agency] had considered and decided [the] issue at a point prior to the instant litigation." As the [Unemployment Compensation Board [of Review] has never formally explained its view of the meaning of the word "during" in Section 402.6 [of the Unemployment Compensation Law,*

*Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, as amended, added by the Act of October 30, 1996, P.L. 738, 43 P.S. § 802.6,] prior to the instant litigation, we agree with appellant that the Commonwealth Court erred in according any deference to the [Unemployment Compensation Board of Review's] arguments contained in litigation-related filings.*

*Harmon v. Unemployment Comp. Bd. of Review*, 207 A.3d 292, 299 (Pa. 2019) (footnotes and some citations omitted) (emphasis added); *see also Malt Beverages Distribs. Ass'n v. Pa. Liquor Control Bd.*, 974 A.2d 1144, 1154 (Pa. 2009) (declining to defer to the agency's "hyper-technical" interpretation of a statutory provision where "there [was] nothing in the record indicating that the [agency] had considered and decided th[at] issue at a point prior to" the appeal).

Here, the Board did not elucidate its position regarding the meaning of "projection" at any time before Jiffy filed its Petition for Review of the October 31, 2019 Order. The first time the Board proffered its interpretation was in its December 27, 2019 Adjudication. Consequently, under *Harmon*, we are not required to defer to the Board's interpretation of "projection" and will conduct our own analysis.[8]

The Gaming Act does not define the word "projection." Section 1903(a) of the Statutory Construction Act of 1972 provides that when words in a statute are undefined, they must be accorded "their common and approved usage." 1 Pa. C.S. § 1903(a). "Where a court needs to define an undefined term, it may consult definitions in statutes, regulations or the dictionary for guidance, although such definitions are not controlling." *Adams Outdoor Advert., LP v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006).

---

[8] With respect to questions of statutory interpretation, our standard of review is *de novo*, and our scope of review is plenary. *Chamberlain v. Unemployment Comp. Bd. of Review*, 114 A.3d 385, 394 n.8 (Pa. 2015).

As the Board correctly noted, Merriam-Webster Dictionary defines "projection," in pertinent part, as "an estimate of future possibilities *based on a current trend*." https://www.merriam-webster.com/dictionary/projection (last visited July 6, 2020) (emphasis added). This is the common and understood meaning of the word "projection" as used in this context. Thus, we conclude that the Board correctly applied this definition when it required Jiffy to demonstrate that its fuel sales projections were based on a current trend.

As noted earlier, Jiffy, as the applicant, had the burden of proving its eligibility for an establishment license. *See* 58 Pa. Code § 421a.l(h). That included showing that it "is projected to sell an average of 50,000 gallons of diesel or biodiesel fuel each month for the next 12 months." 4 Pa. C.S. § 3102. It was not unreasonable for the Board to require Jiffy to provide an evidentiary basis to establish that its estimated fuel sales for the following 12 months were "based on a current trend." *See id.* § 3514(c) (stating that an applicant for an establishment license "shall continue to provide information required by the [B]oard or the [B]ureau and cooperate in any inquiry or investigation" while its application is pending). Jiffy provided that evidentiary basis with Mr. Terrill's report and testimony, which the Board accepted and credited.

Next, we address Jiffy's contention that the Board applied an incorrect standard of proof in determining its eligibility for an establishment license. Specifically, Jiffy contends that the Board should have applied a preponderance of the evidence standard, rather than a clear and convincing evidence standard. We disagree.

In finding that a clear and convincing evidence standard applied, the Board applied and interpreted its regulation at 58 Pa. Code § 421a.1, which provides:

(h) *An applicant shall at all times have the burden of proof.* It shall be the applicant's affirmative responsibility to *establish the facts supporting its suitability under the act and this part by clear and convincing evidence, including why a license, permit, certification, registration or authorization should be issued or renewed by the Board.*

(i) A person holding a license, permit, certification, registration or authorization issued by the Board *shall have a continuing duty to maintain suitability and eligibility* in accordance with the act and this part.

58 Pa. Code § 421a.1(h)-(i) (emphasis added).

The Board determined that the intent of this regulation was to apply a clear and convincing evidence standard to an applicant's suitability *and* eligibility for a license. Although subsection (h) of the regulation specifically references "suitability," it goes on to state that an applicant must provide "clear and convincing evidence . . . *[as to] why a license, permit, certification, registration or authorization should be issued* or renewed by the Board." *Id.* § 421a.1(h) (emphasis added). Subsection (i) of the regulation states that a licensee has "a *continuing duty to maintain suitability and eligibility* in accordance with the [Gaming A]ct *and this part.*" *Id.* § 421a.1(i) (emphasis added). Reading these subsections together and in conjunction with the Gaming Act's requirements, the Board concluded that "the intent [of the regulation] is to create an obligation for applicants to provide *clear and convincing evidence as to any issue relating to why a license should be issued, including the establishment's statutory eligibility*." Bd.'s Adjudication, 12/27/29, at 11 (emphasis added).

It is well settled that the Board's "interpretation of its own . . . regulations must be given considerable weight and deference." *DeNaples v. Pa. Gaming Control Bd.*, 178 A.3d 262, 270 (Pa. Cmwlth. 2018). Giving substantial weight and deference to the Board's interpretation of its regulation, we agree with the Board

22

that, under 58 Pa. Code § 421a.1(h), an applicant must establish by "clear and convincing evidence . . . why a license should be issued by the Board," which necessarily includes eligibility. The Board's interpretation is supported by the plain language of the regulation.

In any event, even applying the stricter standard, the Board still concluded that Jiffy satisfied its burden of proof and granted Jiffy's License. The Board found that "Mr. Terrill's testimony provided clear and convincing evidence that [Jiffy] is projected to sell more than 50,000 gallons of diesel fuel after implementing the initiatives Mr. Gill has committed to and already begun implementing." Bd.'s Adjudication, 12/27/19, at 12. We find no error in this conclusion.

### 5. Substantial Evidence to Support the Board's Order

Finally, Jiffy asserts that the Board's October 31, 2019 Order is unsupported by substantial evidence. Jiffy contends that although the Board concluded that Jiffy "met its burden of proving that it qualifies as a truck stop establishment," it ordered Jiffy to make significant capital improvements to maintain its License. According to Jiffy, these additional requirements for licensure are inconsistent with the Gaming Act and the evidence presented at the hearing. We disagree.

This Court has defined substantial evidence as such "relevant evidence upon which a reasonable mind could base a conclusion." *MKP Enters., Inc. v. Underground Storage Tank Indemnification Bd.*, 39 A.3d 570, 579 (Pa. Cmwlth. 2012). Resolution of evidentiary conflicts, witness credibility, and evidentiary weight are matters within the Board's discretion. *Kiskadden v. Pa. Dep't of Envtl. Prot.*, 149 A.3d 380, 387 (Pa. Cmwlth. 2016) (*en banc*). In deciding whether substantial evidence exists, "[i]t is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder; the critical inquiry is

23

whether there is evidence to support the findings actually made." *Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Review*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008).

We conclude that the Board's decision to require Jiffy's "substantial compliance" with the conditions outlined in its October 31, 2019 Order is supported by the testimony of both Mr. Gill and Mr. Terrill. The Board explained its reasoning as follows:

> Since [Jiffy] has a continuing obligation to maintain eligibility [for an establishment license], [*see* 58 Pa. Code § 421a.1(i),] and because [Mr. Gill] committed on the record under oath to implement the recommendations, the Board believes it is prudent and necessary to impose these conditions, consistent with [Jiffy's] expert's recommendations, to ensure that [Jiffy] remains eligible.

Bd.'s Adjudication, 12/27/19, at 14-15.

The Board's conditions are entirely consistent with Mr. Terrill's testimony. Mr. Terrill testified that, even if Jiffy implemented only 4 of the 6 initiatives, Jiffy would increase its diesel fuel sales to more than 50,000 gallons per month by the end of 2019. N.T., 5/9/19, at 158. When asked "what minimum things" Mr. Gill needed to do to "get to 50,000 gallons [per month]," Mr. Terrill replied:

> Well, I think minimally . . . he needs to . . . get more aggressive . . . with pursuing the . . . National Account Diesel customers, through . . . the [third-party credit] cards and getting the . . . card[s] [and] . . . contacting different trucking companies.
>
> And then the second thing he needs to do . . . is get the [LED] sign up, get the high rise sign up.
>
> And then the third thing he needs to do is get a food tag on the exit logo signage, so that people know that he has food available.

*Id.* at 188. Thus, it was reasonable for the Board to order "substantial compliance" with Mr. Terrill's recommendations.

Jiffy contends that the Board "ignored" Mr. Terrill's opinion in his report that "even without any substantial additional changes, [Jiffy's] existing facility will easily surpass an average of 50,000 gallons of diesel fuel sales per month." R.R. at 466a. However, Mr. Terrill acknowledged both in his report and at the hearing that Mr. Gill had begun to undertake several of Mr. Terrill's suggested measures to increase diesel fuel sales *before* he offered that opinion. Mr. Terrill spent a considerable amount of time discussing Mr. Gill's recent and planned initiatives to increase diesel fuel sales in the coming months. This explains why Mr. Gill opined that Jiffy could likely meet its 50,000-gallon-per-month projections "without substantial *additional* changes." *Id.* (emphasis added).

Furthermore, despite Jiffy's suggestion that the Board's conditions are unreasonable, Mr. Gill testified that, at the time of the hearing, he had already taken steps toward implementing several of the conditions – namely, installing a 60-foot LED sign on Interstate 80, accepting third-party credit cards, speaking with major fast food franchises about adding a restaurant, and adding diesel exhaust fluid to the diesel pump area. N.T., 5/9/19, at 35-45. He further testified that he reviewed Mr. Terrill's expert report, agreed with Mr. Terrill's conclusions, and planned to implement the specific changes Mr. Terrill recommended for increasing diesel fuel sales. *Id.* at 46, 48. Significantly, Mr. Gill did not indicate that he believed any of those measures were unreasonable or imposed an undue hardship on him or his business.

In light of Mr. Gill's testimony, it appears that the *only* condition to which Jiffy objects is paving a one-acre section of the parking lot to accommodate long-

term truck parking. We note, however, that "*substantial* compliance" with the Board's conditions does not mean *full* compliance. As the Board points out in its appellate brief, if Mr. Gill opts not to implement one of the enumerated initiatives (such as paving the parking lot) for financial or other reasons, "the Board is not compelling him to do so." Bd.'s Br. at 39.

Contrary to Jiffy's contention on appeal, the Board did not ignore Mr. Terrill's testimony. Rather, the Board gave deference to his opinions, found his testimony credible, and chose to require "substantial compliance" with his recommended initiatives, which Mr. Terrill opined would help Jiffy increase its diesel fuel sales to the 50,000-gallon-per-month average required by the Gaming Act. Therefore, we conclude that the record contains substantial evidence to support the Board's Order.

## Conclusion

Accordingly, we affirm the Board's October 31, 2019 Order and dismiss Jiffy's appeal from the December 27, 2019 Adjudication.

_____
ELLEN CEISLER, Judge

Judge Crompton did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jiffy Mini Mart, Inc. and
Commonwealth Gaming LLC,
              Petitioners

         v.

Pennsylvania Gaming Control
Board,
              Respondent

:
:
:
:
:
:
:
:
:
:
:

No. 1661 C.D. 2019 and
No. 58 C.D. 2020

# **O R D E R**

AND NOW, this 7th day of July, 2020, the October 31, 2019 Order of Pennsylvania Gaming Control Board is hereby AFFIRMED. The appeal docketed at 58 C.D. 2020 is hereby DISMISSED.

_____
ELLEN CEISLER, Judge